RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0145p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

    *Plaintiff-Appellee,*

    *v.*

TERRENCE DEVOL LONDON, II,

    *Defendant-Appellant.*

No. 24-6144

───────────────

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:22-cr-00310-1—Waverly D. Crenshaw, Jr., District Judge.

Argued: March 17, 2026

Decided and Filed: May 14, 2026

Before: MOORE, GIBBONS, and BLOOMEKATZ, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ARGUED:** Kaycee L. Berente, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbus, Ohio, for Appellant. Nicholas J. Goldin, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee. **ON BRIEF:** Kaycee L. Berente, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbus, Ohio, Kevin M. Schad, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cincinnati, Ohio, for Appellant. Nicholas J. Goldin, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.

───────────────

## OPINION

───────────────

    JULIA SMITH GIBBONS, Circuit Judge. In November 2022, defendant-appellant Terrence London, II, was indicted on a total of six charges: two counts of being a felon in

possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924; two counts of knowingly possessing a controlled substance with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1); and two counts of knowingly possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).  London's charges stem from two separate incidents that occurred on November 18, 2021, and June 6, 2022.

London was ultimately acquitted of the charges arising from the November 18 incident but convicted of the three June 6 charges.  He now appeals his June 6 convictions on several grounds.

For the reasons discussed below, we affirm London's convictions.

**I.**

Because London's appeal concerns only his convictions arising out of the events of June 6, 2022, we focus solely on the facts relating to that incident.

**A.  June 6, 2022**

In March 2022, law enforcement issued a federal warrant for London's arrest in relation to a violation of supervised release stemming from his prior convictions in 2018.  That same month, Investigator Cordell Frazier, a member of the United States Marshals Service Fugitive Task Force, was assigned to locate and arrest London.  In May, a confidential informant later identified as Angela Powell, who maintained a relationship with London, began communicating with Frazier regarding London's potential whereabouts.  On June 6, Powell contacted Frazier and informed him that she was planning to meet London in Antioch, Tennessee later that day.  Frazier alerted the other members of the Fugitive Task Force and proceeded to a parking lot off of Rural Hill Road as instructed by Powell.  Once on location, Frazier spotted Powell in the driver's seat of her parked vehicle, a dark blue Honda Accord.  A short time later, a white Toyota Camry with Florida license plates, the exact type of car Powell had told Frazier that London would be driving, pulled into the lot and parked two spots away from the Honda.

Frazier observed a person matching London's height and "physical makeup" exit the driver's side of the Camry and enter the passenger side of the Honda.  DE 179, Trial Tr. Vol. 2,

Page ID 2313. Less than two minutes later, Task Force officers waiting on standby arrived on scene, approached Powell's Honda, and arrested London. During a search of London's person incident to his arrest, officers uncovered two cell phones, about $9,000 in cash, and a set of car keys, which were later linked to the Camry. As officers detained London, Frazier approached the driver's side of the Camry and observed, through the open car door, a gun lying on the driver's seat. Frazier later testified that he did not know who had opened the Camry's door and no other officers on the scene were able to recall either. Frazier noted a strong smell of marijuana emanating from the vehicle and a marijuana "blunt" was later found at the base of the gear shift. *Id.* at 2326; DE 180, Trial Tr. Vol. 3, Page ID 2449. While being detained, London asked Frazier if he could give Powell the $9,000 found on his person as well as his children's sneakers from the trunk of the Camry. Frazier opened the trunk and saw some shoeboxes inside but denied these requests.

Officers towed the Camry to the police impound lot and obtained a search warrant for the vehicle. A subsequent search of the car yielded the gun initially discovered on the driver's seat (a Glock handgun), packaged marijuana, and a backpack containing a bottle of inositol powder, rubber bands, sandwich baggies, and multiple bags of narcotics including fentanyl, meth, and cocaine. Officers located additional baggies of narcotics, as well as a couple hundred dollars in cash, in the center console of the vehicle.[1]

## B. Trial Proceedings

Ahead of London's trial, the government filed a notice of its intent to use evidence pursuant to Federal Rule of Evidence ("FRE") 404(b). Specifically, the government stated its intent to use London's previous 2018 conviction for being a felon in possession of a firearm to show his knowledge and "lack of accident in possessing the firearms" in the instant case. DE 33, 404(b) Notice, Page ID 75. London opposed the government's plan to use his 2018 conviction,

---

[1]In total, the evidence collected from law enforcement's search of the Camry included: a black Glock handgun and tan magazine from inside the gun, three bags of a purple powder that field tested positive for fentanyl, 25 grams of methamphetamine with fentanyl inside, nineteen Xanax bars, one Lortab pill, two oxycodone pills, one ecstasy pill, 34 grams of a white substance that field tested positive for cocaine and fentanyl, 8.5 grams of marijuana and a partially smoked marijuana blunt, a box of sandwich baggies, a bag of rubber bands, a container of inositol powder, thirty-six rounds of 9 millimeter ammunition, and an extended Glock magazine.

arguing that knowledge and intent were irrelevant to his current charges, and even if the 2018 conviction was somewhat relevant for other reasons, it was nonetheless unduly prejudicial character evidence.  The district court did not rule on the government's motion before the trial started.

London's trial began on February 13, 2023.  The prosecution presented its case regarding the details of the June 6 incident primarily through the testimony of Officer Frazier, who observed London's movements throughout the entire arrest operation.  Officer Demonte Daniel, who assisted in London's arrest on June 6, and Sergeant Christopher Turner, who assisted in the search of the Camry, also testified as to the events of June 6.  However, most of the evidence presented, particularly by the defense, concerned the November 18 incident.

As part of its presentation of evidence regarding the November 18 incident, the prosecution called Officer Daniel Green of the Gallatin Police Department, who served as one of the arresting officers that day, to testify.  During the defense's cross-examination of Officer Green, the following exchange occurred:

> Defense Counsel:  You said part of . . . how you were acting [on November 18, 2021] was because of your belief that [London] was armed, right?
>
> Officer Green:  Yes.
>
> Defense Counsel:  And the only basis for that belief was that [Owens] told dispatch that [London] had a gun on him then, right?
>
> Officer Green:  I'm sorry.  Did you say the only basis for that?
>
> Defense Counsel:  Thinking that [London] had a gun on him [on November 18] was because [Owens] said so?
>
> Officer Green:  We had also been told that [London] had a previous violent history of firearms.
>
> Defense Counsel:  Did you hear my question?
>
> Officer Green:  So the belief that we thought that he had a firearm was based on his previous history of having firearms and the call that [Owens] had stated that he had a firearm at the time.

DE 179, Trial Tr. Vol. 2, Page ID 2155–56.  The day after Officer Green's testimony, the government renewed its Rule 404(b) motion to introduce evidence of London's 2018 firearm possession conviction.  Defense counsel renewed its opposition, maintaining that the 2018

conviction was merely character evidence that should be excluded by Rule 404(b), as well as FRE 403 for lack of relevance. The court granted the government's motion, reasoning that defense counsel had "opened the door" to the admission of the 2018 conviction during its examination of Officer Green the previous day, specifically through its questioning of the basis for Green's belief that London possessed a gun the day of the November 18 incident. DE 180, Trial Tr. Vol. 3, Page ID 2411.

As a result, the government introduced evidence of London's prior 2018 firearm possession conviction that same day through the testimony of Sergeant Turner, who took custody of the scene on June 6 from Officer Frazier:

> Prosecution: Are you aware that [London] has a 2018 conviction for being a felon in possession of firearms? Just "yes" or "no."
>
> Sergeant Turner: Yes.

*Id.* at 2448, 2452–53. After the close of the government's case, London renewed previously filed motions to suppress evidence from the searches conducted during both incidents and, relatedly, moved for a judgment of acquittal in connection with those motions, arguing that the prosecution had failed to prove every element of the offenses charged. The court denied London's motions, finding that the evidence the government presented at trial was sufficient. The defense then presented its case to the jury.

London's trial concluded on February 28, 2023, and jury deliberations began that same day. The next day, the court convened the jury after receiving notes from multiple jurors reporting concerns of heightened conflict during the previous day's deliberations. During a private in-chambers conversation with attorneys from both sides, Juror 12 told the judge that one of the jurors (later identified as Juror 5) was "being very aggressively opinionated," "raised his voice," and that "a couple of [female jurors] [had] sort of shut down" because of his conduct. DE 172, Tr. Proc. Mar. 1, 2023, Page ID 1818–19; *see also* DE 192, Tr. Proc. June 6, 2023, Page ID 4549. Juror 12 also reported that eventually Juror 7 attempted to speak up and tell Juror 5 that he had had his time to speak, leading to a verbal altercation between the two jurors during which Juror 5 allegedly stated "[o]h you want to take that to the Judge? Well, let's take it outside." DE 172, Tr. Proc. Mar. 1, 2023, Page ID 1819, 1820–21.

The judge and attorneys also spoke with Juror 2, who had sent a separate note reporting the conflict. Both jurors informed the judge that despite the tension, the jury seemed to be in a better place that morning and they both felt that it could proceed with deliberations. The judge then spoke to the jury in open court, reminding them of their duty to proceed professionally, before excusing them to resume deliberations.

The next day, the court received the following note, signed by the foreperson: "We have a juror that won't set aside their personal bias and won't discuss. We don't know what to do." DE 175, Tr. Proc. Mar. 2, 2023, Page ID 1895 (sealed). In response, the court called the jury back in and reminded them of their duty to decide the facts, apply the law supplied by the court to those facts, and evaluate the evidence as presented to them without personal biases. The jury returned to deliberations, but the court received another note soon after. The note came unsigned, prompting the court to return it for signature. The bailiff returned with the note, this time signed by Juror 5, and the court read it aloud: "Juror is getting loud with my not guilty verdict." *Id.* at 1906. However, while the court was awaiting the return of that note bearing a signature, it received a second note, signed by the foreperson, stating: "We have come to a unanimous decision." *Id.* Moments later, the court received the following note from Juror 4: "[I]t is very hard to sit on a jury with a juror who admitted before trial . . . he wasn't a good choice for the trial due to his past circumstances." *Id.* at 1906–07.

The court subsequently called the jury to read its verdict. The jury acquitted London on all counts stemming from the November 18 incident, and convicted him on Counts IV, V, and VI, which related to the June 6 incident. The court then polled the jurors; when the judge asked Juror 5 if the verdict, as read, was his verdict, the following exchange occurred:

Court: [Juror 5], is that your verdict?
Juror 5: No, sir. I mean, which one you talking about?
Court: I'm talking about the verdict as read.
Juror 5: Yeah (indicating).
Court: So the verdict as read is your verdict, [Juror 5]?
Juror 5: Yes.

DE 175, Tr. Proc. Mar. 2, 2023, Page ID 1909 (sealed).  Once the jury was excused, counsel for London made a record of the fact that "[Juror 5] initially answered that was not his verdict" and that the court "could observe his facial expressions and his demeanor" to infer that he had in fact been the not guilty vote and "was somehow convinced to change his mind." *Id.* at 1911.  The court then reminded the parties of Local Rule 39.01(g)(2), which states that no attorney, party, or representative of either is allowed to interview a juror post-verdict without prior approval of the court.  Defense counsel proceeded to orally move the court to allow the defense to interview Juror 5, to which the court responded by asking the parties to brief the issue.

### C. Post-Trial Proceedings

Within days of the jury's verdict, London filed a motion to interview Juror 5 pursuant to Local Rule 39.01(g)(2), arguing that his right to a fundamentally fair trial entitled him to question the juror of the circumstances surrounding his potential not guilty vote.  The government opposed the motion and posited that FRE 606(b) prohibited the interview because it would involve inquiry into internal matters related to jury deliberations.  After holding a hearing, the district court ordered London to file a renewed motion to interview Juror 5 that included a list of questions that did not violate Rule 606(b).  London filed his renewed motion, which the government again opposed.  After holding a second hearing, the district court ultimately denied London's motions.  The court concluded that the interests of both Rule 606(b) and Local Rule 39.01(g)(1) would not be served, and instead be violated, if it were to allow London to interview Juror 5.

In addition to his motions regarding Juror 5, London also moved for a judgment of acquittal, arguing that no rational trier of fact could have convicted him on the counts stemming from the June 6 incident based on the government's evidence.  In the alternative, London requested a new trial on the ground that the court should exercise its discretion under Federal Rule of Criminal Procedure 33(a) to vacate his convictions and order a new trial because his case was "profoundly close."  DE 200, Mot. J. Acq., Page ID 4608.  London again raised the issue of Juror 5, arguing that he had been deprived of his right to a unanimous jury verdict and that his verdict must therefore be overturned.  The government opposed London's motion.  The district court concluded that the evidence presented at trial was sufficient to support London's

convictions and both a judgment of acquittal and new trial would be inappropriate. The court further noted that its application of FRE 606(b) in denying London's request to interview Juror 5 was constitutional.

Several months later, on April 25, 2024, London filed a motion for leave to file a successive motion for a new trial, or request for a hearing to resolve a potential conflict with his counsel. In this motion, London informed the court that since the close of his trial in March 2023, the Metro Nashville Police Department ("MNPD") crime analyst who had tested some of the drug evidence in his case, Kayla Fulton, had resigned from her position while under investigation for alleged policy violations that occurred in or around September 2023. One of London's attorneys, Sunny Koshy, began representing Fulton in the MNPD's investigation in November 2023. After the government raised the issue, Koshy alerted London to the potential conflict in early April 2024. In addition to his formal motion, London also personally wrote a letter to the court expressing his belief that Koshy's representation of Fulton constituted ineffective assistance of counsel. Koshy maintained that he had no knowledge of Fulton's relationship to London's case until April 2024, when Fulton formally resigned from her position.

Shortly after London filed his motion, his three trial attorneys, including Koshy, filed a joint motion to withdraw as his counsel of record. The attorneys alleged an irrevocable breakdown in the attorney-client relationship, in large part due to the potential conflict posed by Koshy's representation of Fulton. The district court held a brief conference and afterwards granted the attorneys' motion to withdraw. The district court then denied London's motion for leave to file a successive motion for a new trial, and alternative request for a hearing, without prejudice (allowing London's newly appointed counsel to refile such a motion).

In December 2024, the district court sentenced London to 240 months' imprisonment to be followed by five years of supervised release. London filed a timely notice of appeal to our court.

## II.

Our circuit reviews claims challenging the sufficiency of the evidence presented at trial de novo. *United States v. Reed*, 163 F.4th 338, 364 (6th Cir. 2025). Where, as here, a defendant

additionally moves for a new trial under Federal Rule of Criminal Procedure 33, the district court's decision "is reviewed for abuse of discretion and granted only in the extraordinary circumstances where the evidence preponderates heavily against the verdict." *United States v. Sadler*, 24 F.4th 515, 539 (6th Cir. 2022) (citation modified); *United States v. Hughes*, 505 F.3d 578, 592–93 (6th Cir. 2007).

As to claims concerning the admission or exclusion of evidence under the FRE, we generally review for an abuse of discretion. *See United States v. Bell*, 516 F.3d 432, 440 (6th Cir. 2008). This abuse-of-discretion standard applies to district court decisions to allow evidence of a prior conviction after finding that a defendant opened the door to that evidence. *See United States v. Bender*, 265 F.3d 464, 471 (6th Cir. 2001).

"The district court's legal conclusions that no conflict of interest existed" in counsel's representation of a defendant "are reviewed de novo." *United States v. Osborne*, 402 F.3d 626, 630 (6th Cir. 2005); *see also United States v. Kilpatrick*, 798 F.3d 365, 374 (6th Cir. 2015). "But we review the factual findings underlying the district court's legal conclusions for clear error." *United States v. Siefert*, 161 F.4th 379, 395 (6th Cir. 2025).

Finally, claims challenging a district court's "determination of the proceedings necessary to discover alleged jury misconduct" are evaluated for abuse of discretion. *United States v. Kennedy*, 714 F.3d 951, 957 (6th Cir. 2013) (citing *United States v. Griffith*, 17 F.3d 865, 880 (6th Cir. 1994)); *United States v. Sherrill*, 388 F.3d 535, 537 (6th Cir. 2004).

### III.

London presents four potential grounds for relief in his appeal of his convictions stemming from June 6, 2022. We address each in turn.

### A. Sufficiency of Evidence Claim

London first argues that the district court erred by denying his motion for judgment of acquittal because the evidence presented at trial was insufficient, requiring reversal of his convictions. For the reasons discussed below, we uphold London's convictions as resting on sufficient evidence.

"[A] defendant claiming insufficiency of the evidence bears a very heavy burden." *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006) (citation modified) (quoting *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986)). We must make all reasonable inferences to support the jury's verdict. *Sadler*, 24 F.4th at 539. And we will reverse a judgment for lack of sufficiency only if, "viewing the record as a whole, the judgment is not supported by substantial and competent evidence." *United States v. Grubbs*, 506 F.3d 434, 438 (6th Cir. 2007) (citation modified). Our circuit considers substantial evidence to mean "such relevant evidence as a reasonable mind might accept to support a conclusion." *Id.* at 439 (citation modified). When evaluating the record for sufficiency of evidence, we may not "reweigh the evidence, reevaluate the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015) (citation modified). Instead, we ask, "whether any rational trier of fact could find the elements of the crime beyond a reasonable doubt." *Reed*, 163 F.4th at 364 (citation modified); *United States v. Elder*, 90 F.3d 1110, 1120 (6th Cir. 1996).

### 1. Count IV

Count IV charged London with being a felon while knowingly possessing a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924. At trial, London stipulated to all elements of this crime except for one, which he continues to dispute on appeal: whether he knowingly possessed the firearm at issue.

Possession of a firearm under § 922(g) can be proven through (1) actual possession, or (2) constructive possession. *United States v. Brooks*, 987 F.3d 593, 601 (6th Cir. 2021). The government can use direct or circumstantial evidence to prove possession. *Id.*; *see also United States v. Crump*, 65 F.4th 287, 294 (6th Cir. 2023) ("[W]e can look to circumstantial evidence alone to meet this test."). Here, the government argues that the evidence proves London both actually and constructively possessed the gun found in the Camry on June 6. London disputes both theories. We agree with the government's view of the evidence.

First, we consider actual possession. A person actually possesses a firearm when the weapon is within his "immediate power or control." *United States v. Fairley*, 137 F.4th 503, 512

(6th Cir. 2025). "Whether a defendant had immediate access to the weapon is significant to the question whether he had immediate control of it." *United States v. Morrison*, 594 F.3d 543, 545 (6th Cir. 2010) (citation modified); *United States v. Taylor*, 800 F.3d 701, 709 (6th Cir. 2015) (confirming actual possession where firearm was "immediately accessible" to the defendant). There is no minimum temporal prerequisite to prove actual possession, meaning any reasonable juror could find a violation of § 922(g) if the defendant had knowing control of the gun at any given time. *Crump*, 65 F.4th at 294; *Brooks*, 987 F.3d at 601.

The government's evidence was sufficient to establish that London had actual possession of the gun recovered from the Toyota Camry on June 6. After the Camry arrived at the parking lot where law enforcement was waiting based on Powell's tip, Officer Frazier observed a person matching London's "physical makeup" exit the driver's side of the car and enter the passenger side of Powell's vehicle. DE 179, Trial Tr. Vol. 2, Page ID 2312–13, 2298–99. Less than two minutes later, Task Force officers on standby arrived on scene, approached Powell's car, and arrested London. As officers were detaining London, Frazier approached the driver's side of the Camry and observed, through the open car door, a gun lying on the driver's seat. The discovery of the gun in open view on the driver's seat that London had vacated less than two minutes before shows that he had immediate access to and control of the weapon. *See Taylor*, 800 F.3d at 709 (firearm found next to the defendant on vehicle's floorboard); *Morrison*, 594 F.3d at 545 (firearm found in plain view of defendant in vehicle "less than inches" away). And because London had immediate access and control over the weapon, he actually possessed it. *See Fairley*, 137 F.4th at 512.

We have found sufficient evidence of actual possession in similar cases involving firearms found in vehicles. *See, e.g.*, *Taylor*, 800 F.3d at 709, 710–11 (recognizing evidence that police found a shotgun on the floor of the vehicle next to the defendant supported actual possession); *see also United States v. Murphy*, 107 F.3d 1199, 1208 (6th Cir. 1997) (finding possession where the defendant was the driver and only person in the vehicle, and the weapon was found immediately next to where he had been sitting); *United States v. Harris*, 600 F. App'x 985, 988 (6th Cir. 2015) (per curiam) (finding possession where the defendant was the sole

occupant of the vehicle, its owner, and the guns were found right next to the driver's seat, sticking out from under the seat, and plainly visible).

For example, in *United States v. Morrison*, we recognized actual possession where police discovered a firearm between the driver's seat and the center console. 594 F.3d at 544, 545. We upheld actual possession even though there was no evidence as to "who owned the vehicle in which the gun was found," "there were no fingerprints on the gun," "[a]nd there was no proof that [the defendant] owned the gun." *Id.* at 545. We reasoned that the "proofs were adequate nonetheless," based on two critical facts: (1) "the gun was in plain view for [the defendant] as he drove the vehicle," and (2) the gun was "less than inches away from [him]," supporting the inference that he knew the gun was there and within his control. *Id.* (citation modified). The circumstantial evidence presented in London's case, which showed that the firearm was discovered on the driver's seat of the vehicle he had vacated mere minutes before, establishes the same two critical facts supporting London's actual possession.

While it is true that Frazier testified that he did not know who had opened the driver-side door of the Camry, and no other officer on scene was able to recall either, Frazier also testified that no one approached the Camry in the time between London's exit from the vehicle, and Frazier's approach and subsequent observation of the gun on the driver's seat through the open driver's side door. London was the only occupant of the vehicle, and officers arrested him less than two minutes after his exit from the Camry. From this information, the jury could reasonably infer that London had immediate access to or control of the gun just before exiting the vehicle. And under our circuit's standard, when evaluating the sufficiency of the evidence we must also make that reasonable inference to support the jury's verdict. *See Sadler*, 24 F.4th at 539 (affirming our duty to make all reasonable inferences to support the jury verdict).

Next, we address constructive possession. Constructive possession is proven where the evidence "shows ownership, dominion, or control over the contraband itself or the premises or vehicle in which the contraband is concealed." *United States v. Hall*, 20 F.4th 1085, 1106 (6th Cir. 2022) (citation modified). A defendant's mere presence in a car where a gun is found is insufficient to prove possession, but "other incriminating evidence, coupled with presence, . . .

tip[s] the scales in favor of sufficiency." *United States v. Arnold*, 486 F.3d 177, 183 (6th Cir. 2007) (quoting *United States v. Birmley*, 529 F.2d 103, 108 (6th Cir. 1976)).

The evidence at trial established constructive possession because it showed that London had dominion and control over the Camry where the gun was discovered.  Even though the vehicle was not rented under his name, London was its driver and sole occupant.  *See United States v. Young*, 420 F. App'x 565, 571 (6th Cir. 2011) (per curiam) (affirming constructive possession over firearm discovered in car that the defendant was driving even though his girlfriend had rented it because defendant had "complete control" over vehicle); *United States v. Player*, 201 F. App'x 331, 335 (6th Cir. 2006) (per curiam) (recognizing constructive possession where the defendant was the driver and the firearms were discovered in the glove compartment, even though the car was registered to his wife).  And during a search of London's person incident to his arrest, officers uncovered a set of car keys, which were later confirmed to include a key fob to the Camry.  *See Birmley*, 529 F.2d at 107 (affirming constructive possession where the defendant was occupying the driver's seat of the vehicle and the trunk key was found in his watch pocket).

Additionally, London asked Officer Frazier if he could give Powell the sneakers from the back of the Camry, because they belonged to his kids.  Sneakers were in fact located in the trunk, including kid-size shoes.  *See United States v. Spencer*, 364 F. App'x 197, 199–200 (6th Cir. 2010) (per curiam) (finding constructive possession where firearms were located alongside personal items inside defendant's home).  Moreover, the car that London drove to meet Powell, a white Toyota Camry with Florida license plates, was the exact type of car Powell had told Officer Frazier that London would be driving based on her conversation with London.  *See United States v. Mayberry*, 540 F.3d 506, 515 (6th Cir. 2008) (finding constructive possession where the circumstances surrounding the defendant's vehicle were the same ones that were reported to police ahead of time by a confidential informant).  Powell also told law enforcement that London had attempted to convince her to rent the car for him.  Thus, while London's mere presence in the Camry alone is not enough, *see Arnold*, 486 F.3d at 183, other incriminating evidence coupled with London's presence favors possession here.  This is not a case where the only evidence presented was the mere fact that London drove the car in which the firearm was

found. *Cf. United States v. Bailey*, 553 F.3d 940, 949 (6th Cir. 2009) (finding insufficient evidence where proof was limited to the fact that the defendant was driving the car in which police found the gun).

Although the evidence of London's possession is entirely circumstantial, circumstantial evidence alone is enough to support a theory of possession under § 922(g). *See, e.g.*, *United States v. Garcia*, 758 F.3d 714, 719 (6th Cir. 2014) (finding constructive possession based entirely on circumstantial evidence); *United States v. Newsom*, 452 F.3d 593, 609–10 (6th Cir. 2006) (same). As a result, London's answer to the government's theory of possession, that "there was no evidence tying [him] to the Toyota Camry" is meritless. CA6 R. 26, Appellant Br., at 27. Rather, we find the evidence sufficient to show that London both actually and constructively possessed the firearm located in the Camry on June 6.

### 2. Count V

Count V charged London with knowingly and intentionally possessing multiple Schedule II substances with the intent to distribute them, in violation of 21 U.S.C. § 841(a)(1). Just as with Count IV, London stipulated to each element of this charge except for one, which he continues to dispute on appeal: whether he knowingly possessed the drugs at issue.

Possession of drugs under § 841(a)(1) may also be actual or constructive. *United States v. Russell*, 595 F.3d 633, 645 (6th Cir. 2010); *Reed*, 163 F.4th at 366. The government's theory here rests on constructive possession. As in cases involving questions of firearm possession, constructive possession over drugs exists "where the defendant enjoys ownership, dominion, or control over the contraband itself or the premises or vehicle in which the contraband is concealed." *Reed*, 163 F.4th at 366 (citation modified); *Russell*, 595 F.3d at 645. Physical proximity to drugs or the area in which drugs are found is not sufficient by itself. *See Reed*, 163 F.4th at 366. Drug possession can also be proven by either direct or circumstantial evidence, and the evidence "need not remove every reasonable hypothesis except that of guilt." *See Hall*, 20 F.4th at 1106 (citation modified).

The evidence presented at London's trial supported the government's theory of constructive possession. The evidence in support of London's constructive possession of the

firearm found in the Camry, as already discussed, also supports London's constructive possession of the Schedule II substances found in the vehicle. *See Fairley*, 137 F.4th at 513–14 (analyzing possession of firearms and drugs together); *United States v. Latimer*, 16 F.4th 222, 226 (6th Cir. 2021) (same). Simply put, the evidence that London exercised dominion and control over the Camry supports constructive possession of both the firearm and the contraband found within the vehicle. *See Reed*, 163 F.4th at 366; *Russell*, 595 F.3d at 645.

In addition to the evidence already discussed, however, the government also produced evidence that during the search of London's person, officers uncovered two cell phones and about $9,000 in cash. We have recognized the sufficiency of evidence underlying possession with intent to distribute where it showed cash and/or firearms found near drugs. *See Latimer*, 16 F.4th at 226 ("The government presented evidence showing vast amounts of cash in [defendant]'s bedroom, including in his jeans.").

Moreover, we have previously rejected sufficiency challenges in cases with similar circumstantial evidence. *See, e.g.*, *Hall*, 20 F.4th at 1107 (upholding the sufficiency of evidence where defendant was one of several occupants in a vehicle in which drugs were found and had two cellphones on his person that he used in furtherance of a drug conspiracy); *United States v. Gonzalez*, 512 F.3d 285, 294 (6th Cir. 2008) (finding sufficient evidence where the defendant was the driver and sole vehicle occupant, possessed three cellphones and a screwdriver, and gave police inconsistent explanations for the purpose of his road trip); *United States v. Cantrell*, 807 F. App'x 428, 430–33 (6th Cir. 2020) (per curiam) (sufficient evidence where defendant was one of three people in a car that "contained a loaded gun, large quantities of drugs that indicated trafficking rather than individual use, [and] three sets of digital scales").

Although entirely circumstantial, evidence "sufficient to sustain a conviction . . . need not exclude every reasonable explanation" apart from London's knowing possession of the drugs in the Camry. *See Gonzalez*, 512 F.3d at 294. The jury here indeed found that the evidence presented reasonably pointed to London's knowing possession of the drugs. And just as with London's firearm possession conviction, we must make all reasonable inferences to support the jury's verdict. *See Sadler*, 24 F.4th at 539.

### 3.   Count VI

Count VI charged London with knowingly possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).  To prove this charge, the government needed to show that London: (1) possessed a firearm, (2) committed a drug-trafficking crime, and (3) possessed the firearm in furtherance of that crime.  *See United States v. Jordan*, 100 F.4th 714, 726 (6th Cir. 2024).  The parties dispute whether the evidence was sufficient to support the third element.

As a threshold matter, the parties also dispute whether London waived his sufficiency of evidence claim on these grounds.  The government is correct that London did not raise a challenge to the "in furtherance of" element underlying Count VI in his post-verdict motion for a judgment of acquittal.  We have previously recognized that when a Rule 29 motion raises specific grounds for acquittal, "all grounds not specified are waived."  *United States v. Ramer*, 883 F.3d 659, 682 (6th Cir. 2018) (citation modified).  However, London also correctly notes that "where the record reveals that the trial court (and the government) construed the Rule 29 motion as applying to the entire charge" and reviews the sufficiency of each element, waiver is inappropriate.  *United States v. Mercer-Kinser*, 149 F.4th 870, 878 (6th Cir. 2025).  Here, both the trial court and the government evaluated all elements of Count VI, including the "in furtherance of" element.  Although the trial court and government's discussions of the element were brief, they both nonetheless addressed it.  As a result, we do not find that London's argument regarding the "in furtherance of" element is waived.  *See id.*; *see also United States v. Goldy*, 164 F.4th 493, 501 (6th Cir. 2026) (declining to find waiver where the district court raised issues on its own that the defendant did not in Rule 29 motion).

To prove the "in furtherance of" element, there must be a specific nexus between the gun found and the crime charged.  *United States v. Maya*, 966 F.3d 493, 499 (6th Cir. 2020).  The nature of the required nexus is such that the firearm must be possessed for the purpose of aiding or furthering a drug trafficking crime.  *See id.* at 500.  For the possession to be in furtherance of a drug trafficking crime, we ask whether the firearm was "strategically located so that it is quickly and easily available for use."  *United States v. Mackey*, 265 F.3d 457, 462 (6th Cir. 2001); *United States v. Swafford*, 385 F.3d 1026, 1029 (6th Cir. 2004).  Several other factors inform our

analysis, including "whether the gun was loaded, the type of weapon, the legality of its possession, the type of drug activity conducted, and the time and circumstances under which the firearm was found." *United States v. Ray*, 803 F.3d 244, 263 (6th Cir. 2015) (quoting *Mackey*, 265 F.3d at 462).

The evidence presented at London's trial was sufficient for the jury to find the required nexus to establish the "in furtherance of" element. An initial examination of the evidence shows that the firearm was strategically located. The firearm at issue was located on the driver's seat of the car that London had exited less than two minutes before law enforcement found the weapon. *See United States v. Gill*, 685 F.3d 606, 611 (6th Cir. 2012) (confirming evidence that gun was found where the defendant had rested on a nearby stoop supported that it was strategically located). Police also found extensive quantities of various drugs near the gun in the Camry, as well as $9,000 in cash on London's person. *United States v. Guadarrama*, 591 F. App'x 347, 352 (6th Cir. 2014) (per curiam) (confirming firearm was strategically located because it was found in closet with packaged drugs, digital scales, and $7,000 in cash); *United States v. Marr*, No. 22-1104, 2023 WL 6240105, at *7 (6th Cir. Sept. 26, 2023) (per curiam) (finding evidence that "guns and drugs were near each other" and that the gun was quickly available for use because it was in the defendant's waistband, supported the inference that it was strategically located); *United States v. Ham*, 628 F.3d 801, 809 (6th Cir. 2011) (recognizing gun was strategically located when placed on top of an armoire outside the closet where drugs were found).

Additionally, several of our relevant factors in the "in furtherance of" analysis support the existence of the required nexus. The gun was loaded and therefore ready for use. *See United States v. Brown*, 732 F.3d 569, 577 (6th Cir. 2013) (discussing testimony that firearm was loaded and therefore "ready to go" as a basis for sufficiency of evidence). Because London was a convicted felon, his possession of the gun was illegal, which "help[s] show more than an innocent purpose." *Maya*, 966 F.3d at 501 (citation modified); *see also Gill*, 685 F.3d at 611. Moreover, the gun was a Glock handgun, "a small weapon that is easily transported or concealed on the body, making it more likely to be used 'in furtherance' of a drug crime than would be, for example, a rifle." *See Gill*, 685 F.3d at 611.

The "time and circumstances" factor also supports the required nexus. When law enforcement recovered the gun in the Camry, they also recovered a variety of drugs from the car, as well as thousands of dollars of cash and two cellphones from London's person. Our circuit has confirmed that large sums of cash are indicative of the drug trade. *United States v. Brooks*, 594 F.3d 488, 494–95 (6th Cir. 2010). That indication was further bolstered in London's case by law enforcement's subsequent discovery of multiple bags of narcotics, as well as inositol powder, which the jury heard was a commonly used "cutting agent" in drug sales. *See* DE 180, Trial Tr. Vol. 3, Page ID 2473–85, 2464, 2513. The jury could therefore rationally conclude that London possessed the gun for protection to carry out a drug trafficking scheme. *See Brown*, 732 F.3d at 576–77 (discussing the location of the gun being near drugs as a basis for an "in furtherance of" finding). In fact, in addition to all this evidence, the jury also heard expert testimony that those engaged in drug dealing cannot go to the police because of the illegal activity they are engaged in, so they often possess guns to protect their drugs. Thus, there existed a sufficient basis of proof put on by the government to support the jury's conviction of London on Count VI.

****

In sum, the government presented proof that could lead a rational juror to conclude that sufficient evidence existed to satisfy each of the specific elements London challenges under Counts IV, V, and VI. *See Reed*, 163 F.4th at 364; *Elder*, 90 F.3d at 1120. While the pieces of evidence may not be sufficient on their own, they come together as a whole to form a body of substantial and competent evidence underlying London's convictions. *See Grubbs*, 506 F.3d at 438. As a result, London's case does not present an "extraordinary circumstance[] where the evidence preponderates heavily against the verdict," and the district court did not abuse its discretion by denying London's motion for judgment of acquittal. *Sadler*, 24 F.4th at 539 (citation modified).

### B. Admission of London's Prior Conviction

London next argues on appeal that the district court erred when it determined that defense counsel "opened the door" to the admission of his 2018 firearm possession conviction during

trial. CA6 R. 26, Appellant Br., at 36. He also contends that its admission violated FRE 404(b) and was "unduly prejudicial and deprived [him] of his constitutional right to a fair trial." *Id.* We agree with the district court that London opened the door to admitting the conviction.

"Generally, evidence which is otherwise suppressed or excluded becomes admissible when the defendant opens the door to the issue." *United States v. Harvey*, 653 F.3d 388, 394 (6th Cir. 2011) (citation omitted). This includes evidence of prior bad acts that Rule 404(b) may otherwise preclude. *See, e.g.*, *United States v. Johnson*, 79 F.4th 684, 699 (6th Cir. 2023) (defendant "opened the door" to evidence of prior "campaign-finance violations" by raising the issue of "campaign funds on direct examination"); *United States v. Roper*, 135 F.3d 430, 433–34 (6th Cir. 1998) (allowing evidence of the defendant's criminal history of cocaine base sales because he "opened the door" by testifying that he had never engaged in similar drug transactions previously); *United States v. Johnson*, 24 F.4th 590, 606 (6th Cir. 2022) (defendant's previous instances of domestic violence admitted because "[b]y testifying that he had never restrained a woman, [the defendant] himself opened the door to a pertinent trait that he would never do a certain act"). We review the district court's decision on whether a door has been opened to certain evidence for abuse of discretion. *See United States v. Lattner*, 385 F.3d 947, 955 (6th Cir. 2004).

The district court determined that defense counsel opened the door to evidence of London's 2018 conviction through the cross-examination of Officer Green, one of the officers at the scene of the November 18 incident. Defense counsel and Officer Green had the following exchange:

> Defense Counsel: You said part of . . . how you were acting [on November 18, 2021] was because of your belief that [London] was armed, right?
>
> Officer Green: Yes.
>
> Defense Counsel: And the only basis for that belief was that [Owens] told dispatch that [London] had a gun on him then, right?
>
> Officer Green: I'm sorry. Did you say the only basis for that?
>
> Defense Counsel: Thinking that [London] had a gun on him [on November 18] was because [Owens] said so?

Officer Green: We had also been told that [London] had a previous violent history of firearms.

Defense Counsel: Did you hear my question?

Officer Green: So the belief that we thought that he had a firearm was based on his previous history of having firearms and the call that [Owens] had stated that he had a firearm at the time.

DE 179, Trial Tr. Vol. 2, Page ID 2155–56. The court specifically found that the defense's questioning of the basis for Officer Green's belief that London was armed at the time opened the door for the admission of London's 2018 conviction. The district court accordingly allowed the defense to ask Sergeant Turner, who testified the morning after Green, the yes/no question: "Are you aware that Mr. London has a 2018 conviction for being a felon in possession of firearms?" DE 180, Trial Tr. Vol. 3, Page ID 2448. Turner answered "[y]es." *Id.* Neither the government nor the defense mentioned the conviction again over the seven ensuing days of trial. And although the district court used the parties' 404(b) instruction (to which no one objected), that instruction made clear that the jury could not consider the prior conviction having any direct bearing on London's guilt. The government defends the district court's opening-the-door ruling before our court on appeal.[2]

When one of the parties opens the door on a subject, that party "cannot complain on appeal if the opposing party introduces evidence on the same subject." *Bender*, 265 F.3d at 471 (citation modified). Here, London's counsel explicitly asked Officer Green what information he relied on to form his belief that London would be armed upon law enforcement's arrival to the scene during the events of November 18, 2021. Counsel specifically asked Officer Green whether the "only basis" for his belief rested on the 911 call placed by Larryn Owens, London's long-time girlfriend, reporting that London was at her apartment, had a warrant out for his arrest, and was armed. DE 179, Trial Tr. Vol. 2, Page ID 2155–56, 2103–05; DE 184, Trial Tr. Vol. 6, Page ID 3337–38. His questioning therefore opened the door for the other bases of Green's

---

[2]The parties' briefing also addresses the conviction's admissibility under a traditional Rule 404(b) rationale. The district court, however, did not make its own findings regarding the admissibility of London's conviction under Rule 404(b). Instead, the court stated that it was "going to grant the [government's original Rule 404(b) motion]" because it believed that defense counsel opened the door to London's 2018 conviction during cross-examination of Officer Green, and for "that reason alone [the conviction] [would] be admitted." DE 180, Trial. Tr. Vol. 3, Page ID 2411. We therefore focus our review on the district court's finding that London opened the door.

belief that London was armed that day, which included London's "previous history of having firearms." *See United States v. Collins*, 434 F. App'x 434, 443–44 (6th Cir. 2011) (per curiam) (confirming defense opened the door to prior bad acts by challenging basis for investigator's actions and beliefs regarding the defendant's history of lying). DE 179, Trial Tr. Vol. 2, Page ID 2156. And necessarily encompassed within London's previous history of firearms is London's 2018 conviction for being a felon in possession of a firearm.

Indeed, the district court enjoys broad discretion on questions of admissibility pertaining to relevance and prejudice. *United States v. Chambers*, 441 F.3d 438, 455 (6th Cir. 2006); *Bell*, 516 F.3d at 440. And we have approved the introduction of prior crimes under an opening-the-door rationale in similar circumstances. *See United States v. Ramos*, 861 F.2d 461, 468 (6th Cir. 1988) (recognizing that defense counsel's inquiry into a police officer's reasoning or motivations opens the door to "opportunity to further explain th[ose] reason[s]" (quoting *United States v. Peco*, 784 F.2d 798, 805 (7th Cir. 1986)); *see also United States v. Gaitan-Acevedo*, 148 F.3d 577, 591–92 (6th Cir. 1998); *Bender*, 265 F.3d at 471. We therefore find no evidence on the record to suggest that the district court abused its discretion with its decision that defense counsel opened the door at trial to the admission of London's previous conviction. *See United States v. Ganier*, 468 F.3d 920, 925 (6th Cir. 2006) (district court abuses its discretion when making evidentiary rulings if it "make[s] errors of law or clear errors of factual determination") (citation modified).

## C. Conflict of Interest Claim

Under his third claim for relief, London argues that his Sixth Amendment right to conflict-free counsel was violated by his attorney Sunny Koshy's representation of former MNPD lab analyst Kayla Fulton, who had "tested the controlled substances that [London] was convicted of possessing" while Koshy was also representing London, though she did not testify at trial because the parties stipulated to the nature and amount of drugs seized. CA6 R. 26, Appellant Br., at 44. London further contends that the district court's failure to hold a hearing to ascertain the details of the potential conflict, once made aware of its existence, requires reversal of his convictions. In the alternative, he requests that we remand his case with instructions to hold a hearing to determine whether a conflict of interest existed. For the reasons discussed

below, we do not find a conflict of interest presented by the circumstances in the record before us.

"The Sixth Amendment's right to counsel includes a 'correlative right to representation that is free from conflicts of interest.'"  *Kilpatrick*, 798 F.3d at 374 (quoting *Wood v. Georgia*, 450 U.S. 261, 271 (1981)).  We analyze conflict of interest claims under a modified version of *Strickland*'s two-part test for ineffective assistance of counsel.  *Id.* at 374–75; *Moore v. Mitchell*, 708 F.3d 760, 777 (6th Cir. 2013).  "'[P]rejudice is presumed when counsel is burdened by an actual conflict of interest.'"  *Boykin v. Webb*, 541 F.3d 638, 643 (6th Cir. 2008) (quoting *Strickland v. Washington*, 466 U.S. 668, 692 (1984)); *McElrath v. Simpson*, 595 F.3d 624, 630–31 (6th Cir. 2010).  And the touchstone in determining whether an actual conflict arose is whether the conflict *adversely* affected counsel's performance.  *See Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 844 (6th Cir. 2017); *Brooks v. Bobby*, 660 F.3d 959, 963 (6th Cir. 2011).

Koshy began representing London on January 27, 2023, after being appointed to assist as co-counsel ahead of London's suppression hearings.  Koshy continued representing London through trial and remained counsel of record until the district court granted defense counsel's joint withdrawal motion in May 2024.  Separately, Koshy began representing Fulton in November 2023, in the MNPD's investigation into her alleged conduct in or around September 2023.[3]  So, Koshy began representing Fulton while he remained counsel for London, though it was eight months after London's trial concluded in March 2023.

We acknowledge that this concurrent representation could have given rise to a conflict of interest. Afterall, if Koshy had realized that the lab tech in London's case was under disciplinary proceedings, it may have made sense for him to file a post-trial motion requesting further investigation.  Doing so would have created a conflict of interest for Koshy because putting that argument forward on behalf of London could have implicated his other client, Fulton.  However,

---

[3]The joint motion to withdraw appears to have a typo—it mistakenly states that Fulton's alleged policy violations occurred in September 2024, rather than September 2023.  We know this is a typo because the new trial motion, based on Koshy's alleged conflict for representing Fulton in MNPD's investigation, was filed in April 2024. So, Fulton's alleged policy violations necessarily must have occurred before then.  The government also confirmed the correct dates in its opposition to the new trial motion.

this conflict is ultimately hypothetical because Koshy explicitly stated in counsel's motion for leave to file a successive motion for a new trial that he was not aware of Fulton's association with London's case until April 2024.

We have recognized that a conflict is hypothetical where, as in London's case, the attorney is unaware of the conflict from dual representation. *See United States v. Hopkins*, 43 F.3d 1116, 1119 (6th Cir. 1995); *McFarland v. Yukins*, 356 F.3d 688, 707 (6th Cir. 2004) ("[T]here is no proof of adverse effect . . . if the lawyer was ignorant of the facts giving rise to the conflict[.]" (citation modified)). Because Koshy did not realize that his dual representation of London and Fulton from November 2023–April 2024 posed a potential conflict, he did not have to "make a choice between alternative courses of action depending on which client [was] to be favored," and thus, no actual conflict materialized. *Hopkins*, 43 F.3d at 1119; *see also Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980) ("[T]he possibility of conflict is insufficient to impugn a criminal conviction.").

The district court also did not err by failing to hold a hearing to inquire further into any potential conflict. It is true that nothing on the record suggests that the district court attempted to inquire further into the details of Koshy's representation of Fulton. And it is also true that we have recognized that in cases where the trial court was informed by counsel or the defendant of a potential conflict, but failed to inquire further, prejudice is presumed, and reversal is automatic. *See Harris v. Carter*, 337 F.3d 758, 761–62 (6th Cir. 2003). However, we have also recognized that post-*Cuyler*, "'[u]nless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry.'" *Boykin*, 541 F.3d at 644 (quoting *Cuyler*, 446 U.S. at 347). Here, London has not presented evidence that the district court knew, or reasonably should have known, about Koshy's conflict of interest until Koshy made the court aware of the conflict in April 2024. Additionally, the Supreme Court has declined to fashion a rule mandating automatic reversal of a district court's failure to inquire into a potential conflict where that conflict did not affect counsel's performance. *See Mickens v. Taylor*, 535 U.S. 162, 172–73 (2002). Instead, to obtain reversal, a defendant must establish that the alleged conflict adversely affected his counsel's performance. *Id.* at 173–74. London has not done so here.

**D. Post-Verdict Juror Interview Claim**

Finally, London argues on appeal that the district court should have conducted a post-verdict interview of Juror 5 because the juror's note and the fact that "he was visibly upset after changing his response during the poll" cast doubt on the validity of the jury's verdict. CA6 R. 26, Appellant Br., at 52. London further argues that the court abused its discretion in denying his motion to alternatively interview Juror 5 himself. For the reasons discussed below, we find that the district court did not abuse its discretion when it declined to interview Juror 5 post-verdict and further denied London's motion to do so himself.

Juror testimony concerning a verdict's validity is limited to "whether 'extraneous prejudicial information was improperly brought to the jury's attention; an outside influence was improperly brought to bear on any juror; or a mistake was made in entering the verdict on the verdict form.'" *Kennedy*, 714 F.3d at 960 (quoting Fed. R. Evid. 606(b)). Allegations of improper internal influence do not generally provide a basis to conduct a post-verdict juror interview. *Id.*; *Smith v. Nagy*, 962 F.3d 192, 200 (6th Cir. 2020). Allegations of bias arising from a juror's own personal experiences, like a juror's "wisdom, experience, and common sense," go to internal influence. *Smith*, 962 F.3d at 201 (quoting *Thompson v. Parker*, 867 F.3d 641, 647–48 (6th Cir. 2017)). On the other hand, external influences may include publicity and information related to the case being considered by the jury. *Id.*; *Warger v. Shauers*, 574 U.S. 40, 51 (2014). The district court is only required to wade further into allegations of juror misconduct where "'extrinsic influence or relationships have tainted the deliberations.'" *Garcia v. Andrews*, 488 F.3d 370, 375 (6th Cir. 2007) (quoting *Tanner v. United States*, 483 U.S. 107, 120 (1987)).

First, London asserts that the trial judge should have conducted a post-verdict interview with Juror 5 because "complaints that bias was affecting deliberations," coupled with Juror 5's note and his initial "no" response during the judge's polling of the jurors indicated a non-unanimous verdict. CA6 R. 26, Appellant Br., at 50–52. But London fails to allege that extrinsic information or influence tainted the jury's deliberations, much less Juror 5's individual deliberations. Instead, London's allegations, which concern bias and juror behavior during deliberations and therefore pertain to internal influences, are the precise type of allegations that

our circuit and the Supreme Court have repeatedly determined do not provide grounds to conduct post-verdict juror interviews. *See, e.g.*, *Kennedy*, 714 F.3d at 960 (finding that suspicion of a "compromise verdict" would touch on internal influences); *Smith*, 962 F.3d at 200 (recognizing that jurors' preconceived notions or beliefs about the legal system constitute internal influences); *cf. United States v. Herndon*, 156 F.3d 629, 636 (6th Cir. 1998) (recognizing a juror's recollection that he may have had prior business dealings with the defendant as an *extraneous* influence).

To be sure, and as the government conceded at oral argument, if another juror had threatened Juror 5 with physical violence during deliberations to influence his verdict, the district court may have been required to investigate those allegations further. Oral Arg. 27:15. However, that is not what happened here because it was Juror 5 who allegedly stated, "let's take it outside." DE 172, Tr. Proc. Mar. 1, 2023, Page ID 1819. As a result, London does not provide adequate justification for us to go against our well-established tenet that "the trial judge is in the best position to determine the nature of the alleged jury misconduct and the appropriate remedies for any demonstrated misconduct." *Sherrill*, 388 F.3d at 537 (citation modified); *United States v. Shackelford*, 777 F.2d 1141, 1145 (6th Cir. 1985).

Second, London contends that the district court abused its discretion by denying his alternative request to interview Juror 5 himself if the court declined to do so. He claims that "objective concerns regarding the possibility of juror misconduct" entitled him to interview Juror 5. CA6 R. 26, Appellant Br., at 54. His concerns specifically lie in Juror 5's note, "initial rejection of the verdict," and "his emotional demeanor." *Id.* Yet once again, these concerns all relate to internal influences because they concern juror behavior, precluding London's argument that they provide a basis for him to conduct a post-verdict interview. *See Herndon*, 156 F.3d at 634 ("Examples of internal influences include the behavior of jurors during deliberations, the jurors' ability to hear or comprehend trial testimony, and physical or mental incompetence of a juror." (citation modified)). Indeed, alleged pressure from other jurors "negates any conjecture that it was *external* coercion" which would have prevented Juror 5 from "voting his mind." *See United States v. Lloyd*, 462 F.3d 510, 519 (6th Cir. 2006). Moreover, the questions that London

proposed asking did not relate to the alleged threats of physical violence. Rather, they were not-so-subtle attempts to discern the content of the jury's deliberations.

As further support for his argument that the trial judge erred, London maintains that FRE 606(b), which the trial court based its denial on, "does not apply to interviews with jurors." CA6 R. 26, Appellant Br., at 53. Despite London's assertions otherwise, we have recognized that district courts, in regulating the post-verdict questioning of jurors, may consider whether such an interview would involve questions or issues inadmissible under Rule 606(b). *See, e.g., In re Sittenfeld*, 49 F.4th 1061, 1075 (6th Cir. 2022); *Kennedy*, 714 F.3d at 960; *Smith*, 962 F.3d at 200; *Herndon*, 156 F.3d at 634; *Garcia*, 488 F.3d at 375; *Brooks*, 987 F.3d at 604. Additionally, the proposed questions were not about the supposed influence on Juror 5; they were a fishing expedition aimed at ascertaining the content of the jury's internal deliberations. The district court therefore did not abuse its discretion by invoking Rule 606(b) to deny London's motion.

**IV.**

For the foregoing reasons, we affirm the district court.